Filed 7/9/13  P. v. McPherson CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B245542 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA387815) |
| v. | |
| RICKEY MCPHERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Rickey McPherson, appeals from the judgment entered following a jury trial which resulted in his conviction of two counts of willfully and lewdly committing a lewd or lascivious act upon a 14- or 15-year-old child (Pen. Code, § 288, subd. (c)(1))[1] and one count of unlawful sexual intercourse with a minor who was more than three years younger than he (§ 261.5, subd. (c)). The trial court sentenced McPherson to three years four months in prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

    a. *The prosecution's case.*

K.J., who was 19 years old at the time of trial, testified that McPherson married her mother when K.J. was 10 or 11 years old. After the marriage, McPherson, K.J.'s mother (Paris) and K.J.'s younger sister (Z.J.) lived in a two-bedroom apartment. K.J. shared a room with her sister.

One afternoon when K.J. was 11 years old, she, her sister and McPherson were all lying on her mother's bed watching a movie. McPherson "sort of" kicked K.J., then started rubbing her upper thigh with his foot. McPherson's actions made K.J. uncomfortable and she asked him why he was doing it. McPherson did not answer. However, when K.J.'s sister decided to leave the room and go outside, McPherson moved closer to K.J. and began to touch her upper thigh and vaginal area with his hand. McPherson removed K.J.'s sweat pants and underwear, pulled down his own pants and underwear, put on a condom and had sexual intercourse with K.J. K.J. indicated that "[i]t hurt, and [she] didn't like it at all" when McPherson placed his penis in her vagina. As he was having sex with her, K.J. heard McPherson "breathing hard" and, although it was causing her pain, she did not say anything. When McPherson finished, he "got off of [K.J.]" and "told [her] to go wash up." K.J. went into the bathroom and, as she was washing her vagina with soap and a wash cloth, she noticed she was bleeding. After washing herself, K.J. went to her room and "laid down . . . [b]ecause [she] didn't feel like

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

doing nothing else."  K.J. did not tell her mother, Paris,[2] what had happened because she was out late that evening and did not get home until after K.J. was asleep.  K.J. also "didn't know what [her mother] would do to [McPherson]" and "didn't know what would happen to [her] and [her] sister."  K.J. was afraid that if she told her mother about the abuse, Paris might hurt McPherson and she and her sister would be taken from her.  K.J. and her sister would be "left alone."[3]  K.J. did not tell her sister what had happened because she did not want Z.J. "to have to worry about [it]."

McPherson continued to have sex with K.J. approximately every other week.  He would do so when K.J.'s mother was not at home and her sister was not around.  McPherson had sex with K.J. in her mother's room, in her room, in the living room and in a closet.  On one occasion when he had sex with K.J. in her room, McPherson told her to get on top of him.  McPherson held K.J. by the waist until he had finished.  As he then left the room, McPherson told K.J. not to tell anyone what had happened.  K.J. did not tell anyone because she "didn't know who to tell."

On at least one occasion, McPherson asked K.J. to get his shoes from the closet in the living room where he kept his clothes.  K.J. found one shoe and, as she was looking for its mate, felt McPherson move in behind her.  K.J. felt McPherson's erect penis as he began to "rub[]" her vagina.  He then removed her pants and underwear, as well as his own and, while she was lying on her stomach, had sexual intercourse with her "on top of clothes" in buckets on the closet floor.  On other occasions, McPherson asked K.J. to get him different articles of clothing and would then follow her into the closet and sexually assault her.

One day McPherson came to the door to K.J.'s room and asked her if she would like to make $5.  McPherson would sometimes pay K.J. and her sister $5 to iron his

---

[2]  We refer to K.J.'s mother by her first name not out of any disrespect, but to avoid confusion.

[3]  K.J.'s mother had been "molested and raped as a little girl" and she had told K.J. and her sister, since they were "little girls," that they should tell her if anyone ever touched them inappropriately.

clothes and, believing that that was what he wanted, K.J. said she would like to make the money. However, when she walked into McPherson's and her mother's bedroom, K.J. noticed that "[t]he front of [McPherson's] pants [were] sticking up." McPherson then began to touch K.J. on her vagina and ultimately had sexual intercourse with her while she was lying on her stomach on the bed. After he had finished, McPherson gave K.J. $5.

When McPherson first began to have sexual intercourse with K.J., he did so approximately once a week. However, as time went on, "it started to slow down" and he had sex with K.J. approximately every other week until she was 15 years old. At that time, it "slowed down" even more. When K.J. was 15 and 16 years old, McPherson had sex with her approximately once a month. When K.J. turned 17, she went to Missouri, where she stayed for one year. Although McPherson also went to Missouri, he did not approach K.J. there.

At some point, K.J. realized that what McPherson had been doing to her was wrong. K.J. thought about telling someone about it, but she "didn't know who . . . to go tell." K.J. was also afraid that "people [would] look at [her in] a different way [if she] told them . . . ." However on July 24, 2011, K.J.'s mother, who had read some comments K.J. had made on Facebook, "texted" her and asked her if McPherson had "ever touched [her]." At first, K.J., who "wasn't ready to tell her" mother about the incidents, indicated that he had not. Then, a short time later, K.J. began to cry and she "texted her [mother] back" and told her she had lied when she answered the question her mother had asked earlier and "it was true." K.J.'s mother then came into the room and began to yell at K.J., asking, "He did what[?] He did what[?]" and "Why didn't you tell me[?] Why didn't you tell me[?]" K.J., who at this point was sitting next to her sister on the bed, told her mother that she did not know why she had not told her.

When K.J.'s mother confronted McPherson, he denied having inappropriately touched K.J. K.J.'s mother then went back into K.J.'s room and asked her how long McPherson had been molesting her and what had happened. K.J., however, did not tell her mother. She had "never seen her [mother] like that . . . . Her eyes [were] bloodshot red, and [K.J.] didn't know what she was going to do." K.J.'s mother then went back into

4

her bedroom, where McPherson was getting dressed. There, she took out a gun. She did not, however, have the clip and K.J. could see McPherson and her mother "fighting over the clip for the gun." When K.J.'s mother came back into K.J.'s room she was still holding the gun. McPherson left the apartment and K.J.'s mother then called the police.

Police officers interviewed K.J. and her mother separately. K.J. told an officer what had happened and, at a later time, spoke about the incidents in detail with an Officer Bowser. She told the officer the truth to the best of her recollection.

When questioned about dates and times these incidents had occurred, K.J. could not remember. At trial, she stated, "I don't remember the dates, the months, or none of that. I just know that it happened."

Z.J. is K.J.'s younger sister. She was 18 years old at the time of trial. July 24, 2011, the day K.J. disclosed that McPherson had been sexually abusing her, was Z.J.'s 17th birthday. That evening, Z.J. heard her mother ask K.J. a question and K.J. respond "that [their] dad [had] touched her[.]" Z.J. then heard her "mom and . . . dad [get] into it." Z.J. saw K.J. start to cry and heard her tell their mother she "was sorry." At that point, Z.J. went into another room because she "didn't want to hear it or see anything." She did, however, hear her mother ask McPherson if he had done it, McPherson say "no" and her sister cry.

Z.J. believed McPherson had been a good stepfather and had treated the two girls equally. On July 24, 2011, Z.J. spoke to police officers, then later spoke with an Officer Bowser. When Bowser asked Z.J. if she had ever observed anything unusual, she told the officer, "No, except that when sometimes I would be outside and playing in the front with . . . neighborhood kids and I tried to go in the house . . . , the door would be lo[c]ked . . . ."

Z.J. had, on at least one occasion, seen McPherson's "private part." When she was in the 7th or 8th grade, she was in his closet looking for his shoes when he approached her with the "fly part" of his pajama pants open. Z.J. told McPherson that she could see his penis and he "went out to go fix hisself."

At the time of trial, Z.J. and K.J. were speaking with each other almost every day. They did not, however, ever talk about what McPherson had done to K.J.

Los Angeles Police Department Officer Paul Bowser was the investigating officer in McPherson's case. During his interview with K.J., she told the officer that McPherson had begun to sexually abuse her when she was 11 years old and that the abuse occurred in different parts of the house, including her mother's bedroom and McPherson's closet.

Bowser spoke with McPherson[4] twice on August 15, 2011.[5] The officer first interviewed McPherson in his office at the police station and, after advising McPherson of his *Miranda*[6] rights, asked him questions regarding the allegations which had been made by K.J. In response, McPherson denied having had sexual intercourse with K.J. until after she had turned 18 and, even then, he indicated "it was for a very short amount of time." McPherson stated it occurred the first time when "they were both on the . . . bed and [Z.J.] . . . was outside the house and he said there was something that [K.J.] was doing and he told [her] that it was . . . arousing him." He asked K.J. "what she wanted to do about it. And they had this back and forth, and he got up and . . . put his penis in her vagina for a very short amount of time. . . . [Z.J. then] called him on his phone because she was outside trying to get inside of the house. . . . [A]t that point . . . [McPherson told K.J.] to go and let [Z.J.] into the house and so they stopped doing what they were doing." Also during the first interview, McPherson told the officer that his wife, Paris, had told him and K.J. that her, Paris's, stepfather had tried to molest her. According to McPherson, K.J. "took it and ran with it."

The second interview occurred several hours later at a different police station. Before questioning McPherson, Bowser again advised him of his *Miranda* rights.

---

**4**     It had been stipulated McPherson was born on December 21, 1958.

**5**     Both interviews were videotaped and DVD's of the interviews were played for the jury. Between the interviews, McPherson took a polygraph test. The fact that he took the test and its results were not admitted into evidence.

**6**     *Miranda v. Arizona* (1966) 384 U.S. 436.

McPherson then told Bowser that, when K.J. was 13 or 14 years old, "he had sex with her approximately two times, and from the age of 13 or 14 to 16, he had sex with her six times." McPherson told Bowser that he did not know if he was the first person who had ever had sex with K.J., but that on the first occasion "he had a hard time getting his penis into her vagina." On each occasion, they had sex on the foot of McPherson's bed. He never had sex with K.J. in his closet and he never told her "not to tell anybody."

Dr. Mitchell Eisen is a psychologist who specializes in the study of "memory, memory for the events in our lives, eyewitness memory and suggestibility." He had previously testified as an expert in the area of memory with regard to child sexual abuse. Eisen had not interviewed K.J. or any of the other witnesses in this case. He was there to testify regarding principles of memory "in the abstract." Eisen testified about "child sexual abuse accommodation syndrome." He explained that "when [a child is] in a secret situation with an adult who's telling [them] this is how the world works, [that child] will often feel helpless in the face of this and will tend to accommodate" the adult. If the abuser is a close family figure, many children will delay disclosing abusive behavior. A child does not know what goes on outside of his or her family and will assume that what is happening is normal. Accordingly, "delay [in disclosing] is very common." In fact, "most kids never tell." In addition, many children recant. Eisen stated, "It is very common for kids to be delayed and inconsistent in their disclosing and [then] outright take it back." According to Eisen, it is fairly universally agreed that "most people who have experienced child sexual abuse do not tell about it." When victims do disclose abuse, it is usually "retrospective[ly,]" as adults.

       b. *Defense evidence*.

Paris McPherson is married to McPherson and is K.J.'s mother. She has another daughter, Z.J., and she loves them all. Paris described herself as "not the easiest person to get along with." She is, however, a "no nonsense" person and would not lie for her daughter or her husband.

Paris, who is an LVN who works "in the psychiatric field with children 5 to 12 years old," had been sexually molested by her stepfather when she was 12 years old.

7

Although she had told her two daughters that it had happened, she had never gone into detail regarding the incident because she felt that it was not appropriate to do so. However, she had frequently asked her daughters if they had been inappropriately touched "because of [her] experience."

In the several months before she graduated from high school, K.J. had been extremely difficult. She had frequently complained about McPherson and, according to Paris, "it was just horrible in [her] house."

In June 2011, after K.J.'s high school graduation, Paris' stepmother asked Paris what she would do if she discovered that K.J. and McPherson had been having sexual encounters. Paris at first believed that her stepmother was "out of [her] . . . mind" and she told her stepmother that she would kill them both and "they both knew that." After that, Paris and her stepmother "just left that conversation alone." Things then "exploded" on Z.J.'s birthday in July.

When Paris came home from work on July 24, 2011, K.J. began to complain to her about McPherson. Paris then went onto Facebook and noticed that K.J. had placed "all this stuff on there about [how she] hate[d] this house, this, that and the other." Paris went to speak to K.J. about the postings, but felt herself getting angry. She decided to instead go into the living room and send K.J. a text message asking her what was wrong with her. In the meantime, McPherson came home. Paris asked him if he knew what was going on with K.J. and he indicated he did not. Paris then sent K.J. a text message in which she asked K.J. if McPherson had been "touching [her.]" At first K.J. sent to Paris a text message in which she said, "No, nah, he ain't touching me." K.J. then sent Paris a second text message in which she said, "Momma remember that question you asked me earlier[?] . . . I lied before. He did."

Paris jumped up from the couch, went into K.J.'s room and repeatedly asked her what McPherson had done to her. K.J., who was sitting on the floor just repeatedly told Paris she was sorry. Paris responded by asking K.J., "What are you sorry about[?] You need to tell me what the hell happened to you right now." When K.J. told her mother McPherson had been touching her since she was 11 years old, Paris stated she was going

8

to kill him.  When McPherson then came into the room, he told K.J. to "stop lying" and to tell her "momma the truth."  Paris pushed McPherson up against the wall, told him not to speak to her daughter and to talk to her.  Paris then left K.J.'s bedroom and went to get her gun.

McPherson followed Paris and, as she was attempting to place the clip in her gun, he grabbed her hand, got hold of the clip and "took off [toward] the door."  Paris went to the kitchen to get her butcher's knife, intending to "cut" McPherson.  However, before she could catch up with him, a neighbor, who had heard the commotion, came into the apartment, stood in Paris's way and told her to calm down.  At that point, Paris "came to [her] senses a little bit."  She telephoned her stepmother, who told her to call the police.  When Paris called the police, she told the individual who answered the phone her "daughter [had just] told [her] that [her] husband ha[d] been molesting her since she was 11 years old."

Several days later Paris, based on the information she had at the time, concluded McPherson and K.J. had not had sex until K.J. was 18 years old.  Paris did not believe McPherson had been molesting K.J. when she was only 11 years old.  She had "found no evidence" of abuse.  Although Paris was aware of the fact McPherson had told police he had sex with K.J. when she was 13, she believed him when he told her that he and K.J. did not have sex until K.J. was 18.  Paris believed when McPherson told police he had been molesting K.J. since she was 13  he was speaking as a "broken" man, one who had "shut down."  When Paris watched the video tapes of Bowser's interviews with McPherson, she thought McPherson looked "[l]ike a person [who] just [could not] take it no more, that's just tired, that's just [willing] to give up, that's just like it's whatever, okay, let's get it over with."

Paris acknowledged "in the last couple of months leading up to when the police c[a]me to [her] house that [K.J. had been] acting out."  She had been "wearing provocative clothing" and "leaning over in front of [McPherson]."  In addition, it had appeared to Paris that K.J. had had a problem with McPherson "since she was a child" and she "had it out for him."  Paris was of the opinion K.J. believed she and K.J.'s father

9

"should be together" and K.J. had acted antagonistically "with [her] first husband" as well as McPherson. K.J. had not, however, accused Paris's first husband of sexually molesting her. Finally, Paris had discovered that K.J. had been "sleeping around with [her] friend's [17-year-old] son." Paris attributed much of K.J.'s behavior to the fact she was having that affair. Paris did not believe K.J.'s testimony McPherson had been having sex with her since she was 11. Paris believed she and K.J. were "very much alike" and K.J. was simply "imitating [Paris'] life."

Ethel Rasdale is a support services manager at Kedren Community Mental Health Center. Her duties there include "transportation, environmental services, and procurement." Rasdale knows McPherson because he is a "transportation driver" at the center and she is his supervisor. Rasdale has been signing McPherson's time sheets since at least 2004. By reviewing McPherson's time sheet from January 2004, Rasdale could tell he had consistently worked several hours of "overtime" each day that month. The time sheet showed he had worked 104 hours. McPherson's regular hours were from 6:00 a.m. to 2:30 p.m. However, he frequently worked up to four additional hours. This pattern of working overtime continued until 2008, when the center hired additional drivers. From that time on, McPherson's time sheets indicated he usually worked a regular eight-hour shift.

  c. *Rebuttal*.

On the day Officer Bowser first met Paris, K.J. and Z.J., Paris told Bowser that "she was having a lot of problems with [K.J.]" and K.J. had repeatedly told Paris that she wished to move to St. Louis. Bowser had told Paris that he thought it was "a good idea" because K.J. "had disclosed  all . . . of this sexual abuse at the hands of [McPherson], and [the officer] thought it was a good idea for her to move out there [to get] some separation from him."

  2. *Procedural history*.

Following a preliminary hearing, on February 3, 2012 an information was filed in which McPherson was charged in the first count with the continuous sexual abuse of a child under the age of 14 years, a serious felony (§§ 288.5, subd. (a), 1192.7, subd. (c),

10

1203.066, subd. (a)(8)); in the second and third counts with committing a lewd act upon a child who was at least 10 years younger than McPherson, a felony (§ 288, subd. (c)(1)); and in the fourth count with committing unlawful sexual intercourse with a minor, not his spouse, who was more than three years younger than McPherson, a felony (§ 261.5, subd. (c)). At arraignment, McPherson entered pleas of not guilty to each of the alleged counts and denied all the special allegations.

At proceedings held on July 30, 2012, the prosecutor indicated McPherson faced a term of 18 years in prison. The prosecution had offered him a term of 12 years in exchange for a plea, however McPherson had rejected the offer and made no counter-offer.

Prior to jury selection, counsel for the victim requested that a "child sexual victim accommodation witness" be allowed to testify. After hearing argument by both parties, the trial court determined it would allow the testimony. The court indicated, although the victim was 19 years old at the time of trial and the alleged incidents began when she was either 11 or 14 years old, such an expert might assist the jury in understanding why the victim had not reported the abuse sooner. The court continued, "[Either party] may ask [the expert] . . . a hypothetical question, but [the expert is] not going to opine on the ultimate issue, but simply give the jury some expert testimony that may aid them in their decision."

Defense counsel next indicated the prosecution might attempt to present evidence that McPherson had some sexual contact with this victim when she was 18 years old, "when she was an adult." Counsel indicated the prosecutor had attempted to bring it "out [at] the prelim, [and] we shut it down, the judge struck it." Defense counsel continued, "I want to make sure that we're not going to discuss . . . that it may have happened when she was an adult. . . . I don't think that's relevant." The trial court responded, "Based on the dates referenced in the four counts, it doesn't appear to me that the D.A. is going to get into that."

During her opening statement, the prosecutor indicated that during an interview with an officer McPherson had denied any improper conduct with the victim, then said

11

"well, yeah, I had sex with her, but only when she turned 18. I did not have sex with her before that." Defense counsel requested a "sidebar" and stated the parties had agreed that if some kind of contact had occurred when the victim was 18, "it was not relevant and . . . was not going to be introduced in this trial." McPherson's counsel then moved for a mistrial. The prosecutor indicated, although defense counsel had given her "a list of her objections," that did not mean that she, the prosecutor, had agreed to all of them. The prosecutor stated that under "the rule of completeness when [defense counsel asked for the discussion of the sexual allegations with the officer] to come in, then it [all should] come[] in whether [McPherson] says that it didn't happen at all, which he does sometimes, or whether he ultimately says it only happened when [the victim] was 18." The trial court stated it would give defense counsel a final ruling on her motion the following day, after it had reviewed Evidence Code section 356.[7] In the meantime, the trial court directed both parties to "stay away [from McPherson's statement he only had sex with the victim after she had turned 18] for the rest of [their] opening statement[s]." The trial court indicated defense counsel's motion was, at that time, denied. However, if it found "there [was] some prejudice that [c]ould only be cured by mistrial, [it would] do that or," at the very least, "admonish the jury."

After K.J. completed her direct testimony, the trial court again considered defense counsel's motion for a mistrial. After hearing argument by both parties, the court determined the comment made by the prosecutor during her opening statement, that McPherson had sex with the victim when she was 18 years old, was not so prejudicial that the only remedy would be to declare a mistrial. Instead, the court indicated it would "issue an admonishment to the jury to ignore that issue." The court continued, "There will be no evidence admitted concerning that issue, there will be no testimony concerning that issue—that statement made by the D.A. in her opening statement. I'll admonish the

_____

[7]     Evidence Code section 356 provides in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ."

12

jury to ignore that and not to consider it for any purpose in this trial. That's the court's ruling."

After the prosecution presented all of its evidence, defense counsel made a motion for dismissal of the action pursuant to section 1118.1, arguing the evidence presented by the People had been insufficient to show McPherson committed the alleged crimes. The trial court denied the motion, indicating the People had "submitted sufficient evidence to overcome an 1118.1 motion."

After the evidence was presented, the trial court instructed the jury. One of the instructions stated: "Now[,] during the trial, the testimony of Dr. Eisen was admitted for a limited purpose. . . . In addition, you've heard testimony or evidence that the defendant had sex with the [victim, K.J.], when she was 18, the age of majority. That sexual contact, if you believe that it occurred, is not at issue in this case and the defendant is not being charged with any crime arising from that contact. Do not draw any inference about his guilt or innocence regarding the charges in this case based on any contact he may have had when she was 18."

On November 2, 2012, after the trial court had concluded its instructions and the parties had given their arguments, the jury retired to deliberate. McPherson then waived his right to be present for any readback of testimony or questions submitted by the jury, indicating he wished to be present only for the reading of the verdicts.

Later that day, in the presence of both defense counsel and the prosecutor, the trial court indicated the jury had requested a copy of K.J.'s testimony. The trial court indicated it would "see if [it could] . . . narrow" the request. The court continued, "I'm going to ask them [if they] want direct examination, cross-examination or both and see what they say." After a time, the jury responded. The trial court indicated "they want[ed] both direct and the cross-examination." Accordingly, the court directed the court reporter to prepare the testimony and, as previously agreed to by the parties, go "into the jury room and read that testimony to the jury."

The following Monday, November 5, 2012, the trial court indicated the court reporter had "prepared the proffered readback" and that both counsel had been given the

13

opportunity to review it. The court reporter then read the testimony to the jury in the jury room.

On the afternoon of November 5, the jury indicated it had reached verdicts. The foreperson handed the verdict forms to the bailiff who, in turn, handed them to the trial court. After the trial court reviewed the forms, it addressed the foreperson and stated, "Are you telling me that the jury has reached no verdict on count 1?" The foreperson responded, "That is correct. We did not reach a unanimous verdict on count 1. As per your instructions, we filled out the forms, [for the counts for which] we did reach unanimous [verdicts] and handed you back the other sheets blank." The following colloquy then occurred: "The court: Is the reason that you didn't reach a verdict on count 1 because you were hung on that count? [¶] [The foreperson]: Hung, meaning? [¶] The court: Unable to reach a unanimous—the 12 of you could not agree on one verdict or the other? [¶] [The foreperson]: That is correct. [¶] The court: I know that you've been deliberating since late Friday. Were I to give you additional time, do you think that [with] further consideration by you as a jury, you might be able to reach a verdict on count 1? [¶] [The foreperson]: As the foreperson you want me to speak for the jury? [¶] The court: Exactly. [¶] [The foreperson]: I do not think so. [¶] The court: Okay. Is there anything—I know that you asked for readback, is there anything the court can do in aid—in facilitating [the] . . . reaching [of] a verdict either way on count 1? [¶] [The foreperson]: I think the jury feels that we have all the evidence that we needed . . . to come to a verdict. [¶] The court: . . . [D]o the other jurors feel the same way about that? Okay. Everyone appearing to nod in agreement. [¶] I do note that we have verdicts on counts 2, 3 and 4. Let me hand those verdicts to the clerk who will read them into the record."

The court clerk indicated that the jury had found McPherson "guilty of the crime of a lewd act upon a child on or between February 22nd, 2007 and February 21st, 2008, in violation of . . . section 288[, subdivision] (c)(1), a felony as charged in count 2 of the information." The jury had also found McPherson "guilty of the crime of a lewd act upon a child on or between February 22nd, 2008 and February 21st, 2009, in violation

14

of . . . section 288[, subdivision] (c)(1), a felony as charged in count 3 of the information." Finally, the jury found McPherson "guilty of the crime of unlawful sexual intercourse on or between February 22nd, 2009 and February 21st, 2010, in violation of . . . section 261.5[, subdivision] (c), . . . as charged in count 4 of the information." The jurors then each indicated that those were their verdicts.

The trial court again addressed the foreperson and stated, "I'm going to ask you for the ratio on the voting of count 1, without telling me [how many were] for guilty or not guilty, if you can just give me the numbers the last time you voted . . . ." The foreperson indicated the vote had been "roughly 50/50" and the vote had been fairly evenly split each of the approximately five times the jury had voted. The trial court then, after indicating it was unlikely further deliberations would result in a verdict, declared a mistrial as to count 1.

Although defense counsel argued McPherson, who had been free on bail throughout the proceedings, should remain so until sentencing, the trial court indicated it was its practice to remand defendants once they had been found guilty of felony crimes. Sentencing was then set for November 21, 2012, or within 20 days of that date.

At proceedings held on November 21, 2012, the prosecutor indicated the People did not intend to retry McPherson on count 1, the continuous sexual abuse of a child under the age of 14 years, a serious felony. The trial court, accordingly, dismissed the count.

After hearing argument by both counsel and comments from the victim's mother, Paris McPherson, and grandmother, Lorene Galbert, the trial court indicated that, with regard to elements in aggravation, it had found the victim was vulnerable and the defendant "took advantage of a position of trust and confidence to commit the crime[s]." In mitigation, the trial court noted McPherson "ha[d] no prior record" and "arguably voluntarily acknowledge[d] wrongdoing during the interview at the police station . . . ." The court then denied probation and sentenced McPherson to the mid-term of two years in prison for committing a lewd act upon a child at least 10 years younger than he as alleged in count 2. For his conviction of count 3, committing a lewd act upon a child at

15

least 10 years younger than he, the trial court sentenced McPherson to a consecutive term of one-third the mid-term, or 8 months in state prison. With regard to count 4, McPherson's conviction of committing unlawful sexual intercourse with a minor more than three years younger than he, a felony, the trial court imposed a consecutive sentence of one-third the mid-term, or 8 months in prison.[8] In total, McPherson was sentenced to three years four months in prison.

After awarding McPherson presentence custody credit for 27 days actually served and 4 days of good time/work time, or 31 days, the trial court imposed a $240 restitution fine (§ 1202.4, subd. (b)), a stayed $240 parole revocation restitution fine (§ 1202.45), a $120 court operations assessment (§ 1465.8, subd. (a)(1)), a $90 conviction assessment (Gov. Code, § 70373), and a $300 "sex offender fine" (§ 290.3). In addition, the trial court ordered McPherson to register as a sex offender within five days of his release from prison.

McPherson filed a timely notice of appeal on November 21, 2012.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed April 12, 2013, the clerk of this court advised McPherson to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

---

[8]    Although in this case the prosecutor charged the violation of section 261.5, subdivision (c) as a felony, the offense is a wobbler and may be charged as either a felony or misdemeanor. The trial court noted that the sentence for count 4 could be served in county jail.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.